UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
BARBARA FORDE,

               Plaintiff,                              **NOT FOR PUBLICATION**
                                                  **MEMORANDUM & ORDER**
-against-                                         10-CV-2445 (CBA)(LB)

PATRICK DONAHOE, Postmaster General[1]

               Defendant.
------------------------------------------------------------------x
AMON, Chief United States District Judge:

       Plaintiff Barbara Forde, pro se, has brought suit against her former employer, Patrick

Donahoe, Postmaster General for the United States Postal Service (USPS), alleging

discrimination and retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e

et seq. In particular, Forde alleges that she was subject to racial discrimination and retaliation

when she was not selected for a position for which she applied in April 2009, and when her job

title was abolished in July 2009. The defendant now moves for summary judgment, seeking

dismissal of the complaint in full. For the reasons set forth below, the defendant's motion for

summary judgment is granted.


I.      **Background**

       Forde has not provided a linear factual narrative in the many papers she has submitted to

the Court, but the following facts can be discerned from Forde's deposition testimony and the

documents of record. The parties appear to agree that the two main events at issue in this

litigation are Forde's non-selection for a Triboro District Contract Technician position in April

2009, and the abolishment of her in-plant Contract Technician position in July 2009. (Pl. Opp.

---

[1] This action was originally filed against former Postmaster General John Potter. Patrick Donahoe, who became
Postmaster General on October 25, 2010, is automatically substituted pursuant to Fed. R. Civ. Proc. 25(d).

6/15/11 at 24; Deposition of Barbara Forde, Dec. 8, 2010, at 77.)  The Court will thus focus primarily on the facts surrounding those two incidents.

Forde is an African-American woman who has been employed at USPS since 1986. Forde began her career at USPS as an Automated Mark-Up Clerk for the postal facility located at 271 Cadman Plaza, Brooklyn, New York. (Forde Dep. at 41-42.)  In 1987, Forde was promoted to Maintenance Control Clerk. (Id.)  In 1992, Forde was transferred to the Brooklyn Processing and Distribution Center (P&DC), located at 105 Forbell Street, where she remained in the position of Maintenance Control Clerk until 2002. (Id. at 43.)  She reported to William Nieves, Manager of Maintenance Operations Support.  (Id. at 84.)

In or around February 2001, Forde applied for a Contract Technician position at the Brooklyn P&DC, but was not selected.  (Forde Dep. at 78-83; see also Compl. at 66.[2])  For clarity, this position will hereinafter be referred to as a "Plant Contract Technician" position, although all the "Contract Technician" positions referred to in this opinion were internally regarded as the same title.  (See Compl. at 23.)  Forde subsequently filed a grievance alleging that Nieves had discriminated against her on the basis of an alleged physical disability: a weakened heart condition that limits her ability to lift heavy objects. (Id. at 34-45, 81-84.)  After an arbitration, in September 2002, Forde was awarded the position. Id. at 84, 99. The pay grade for the position was Level 6, at which Forde remained until around 2008, when all the Contract Technicians were moved up to Level 7.  (Id. at 44.)

Following the arbitration, Forde continued to be supervised by Nieves in her new position. (Id. at 87.)  Forde disliked working under Nieves, however, as she felt that Nieves had "mood swings," and that the work environment had become hostile because of the arbitration.

---

[2] Forde has annexed many pages of EEO Investigative Affidavits, correspondence, and other documents to her complaint.  The page numbers cited refer to the page numbers assigned by the ECF filing system.

(Id. at 87-90.)  Forde complained to management and in the beginning of 2003, she was

transferred from Maintenance Operations to In-Plant Support, which was located on a different

side of the same facility.  (Id. at 84, 87-90.)   Forde remained a Plant Contract Technician but

was now supervised by Leon Eng.  (Id.)  She remained unhappy in her new environment.  At her

deposition, she predominantly attributed this unhappiness to the fact that Eng, in her view, did

not properly follow the USPS internal regulations and procedures.  (Id. at 90-93, 101.)  Forde

remained under Eng's supervision as a Plant Contract Technician until 2009.  (Id. at 199-200.)

It appears from the record that during the 2001 to 2009 time period, the position of

"Contract Technician" was not clearly defined at USPS, but rather was given to employees

performing a variety of administrative duties, and was changing over time as technological

advances rendered certain responsibilities inefficient.  (See Compl. at 78-79.)  Forde testified that

her understanding of the traditional role of a Contract Technician was to oversee work contracts

that USPS awarded to outside entities.  (Forde Dep. at 46-48.)  She also stated that when she was

in her position as a Maintenance Control Clerk, she was overseeing certain contracts and

performing some of what she understood to be Contract Technician functions, because

management asked her to.  (Id. at 52-53.)  Once she was actually awarded the title of Contract

Technician and moved to In-Plant Support, however, her duties no longer consisted of

overseeing contracts, except for one vehicle maintenance contract around 2005.  (Id. at 54-55.)

Eng stated in his EEOC affidavit that in-plant Contract Technicians usually handled

contracts under $2500, which over the years had dwindled in number.  (Compl. at 27.)   Major

contracts were typically the responsibility of employees outside the plant called Contract

Representatives, who worked out of centralized units called Category Management Centers.

(Compl. at 27, 79; Pl. Opp., 5/20/11, Ex. 13 at 3-4.)  Forde admitted in her deposition that other

employees in the Contract Technician position were also not overseeing contracts during her tenure, and that she was unaware of what their duties were. (Forde Dep. at 151-53, 192.) It thus appears uncontroverted that while there was certainly some blurring of responsibilities regarding the oversight of USPS contracts, starting around 2002, the duty of "overseeing contracts" was no longer a core function of the Contract Technician position.

Once Forde moved under Eng's supervision in 2003, her duties consisted primarily of purchasing materials needed at the plant. (Id. at 49-50.) However, those duties shifted over time, as well. Around 2004, a new electronic program called eBuy allowed departments to do much of their own materials purchasing online and get reimbursed directly. (Id. at 50; Compl. at 15.) Thus, Forde was given responsibility for making outside purchases, which could not be completed on eBuy, with her company credit card. (Forde Dep. at 56-57.) Forde testified that from 2003 to 2009, the substance of her purchasing work as a Contract Technician remained consistent, although she felt that starting around 2007 the amount of work began decreasing as higher level employees began handling their own purchasing. (Id. at 57-58, 163-64, 242-44.) It also appears from the record that during this time period, USPS was consolidating departments from Brooklyn and Queens into one Triboro District unit. (Id. at 142, 167.)

On September 27, 2007, Forde filed a charge with the National Labor Relations Board, alleging that management was depriving her of work duties in violation of a collective bargaining agreement. (Abell Decl., Ex. I.) It appears that this NLRB charge also made reference to Forde's allegation that a co-worker, Willie Arroyo, had sexually harassed her by grabbing himself inappropriately in her presence in May 2007. The matter proceeded to arbitration only on the claim arising under the collective bargaining agreement, and on August 8, 2008, an arbitrator denied Forde's grievance in its entirety. (Compl. at 76-80.)

In August 2008, Human Resources posted an announcement advertising a Contract Technician vacancy in the Triboro District Finance Department (again for clarity, this position will hereinafter be referred to as the "District Contract Technician" position). (Id. at 166-67.) The Triboro District Finance Department was housed in the Brooklyn P&DC, the same facility where Forde had worked since 1992. (Id.) Howard Taub, the Triboro District Manager of Budget/Finance, stated in his EEOC affidavit that the District Contract Technician position had a broader scope of responsibility than the Plant Contract Technician position, and involved "dealing with over 150 customer service offices, the entire district administrative staff, as well as three mail processing plants." (Compl. at 23.) However, it is undisputed that the positions were at the same seniority level and had the same pay. (Forde Dep. at 225; Compl. at 23, 83; Pl. Opp., 5/20/11, Ex. 14-17.)

After seeing the August 2008 announcement, Forde inquired about the position and was told it had been cancelled, although she never found out why. (Forde Dep. at 165-69.) Taub stated that the announcement was cancelled because the Triboro Finance Department never received official "authorization/approval" to fill the position. (Compl. at 21.)

Shortly thereafter, however, in September or October 2008, USPS manager Ed Panzone approached Forde and offered her a Contract Technician position in the Triboro District Finance Department. (Forde Dep. at 125-31, 170.) Forde turned down the offer. (Id. at 170.) Forde testified, "I don't know why I said no, actually," but she thinks it may have been because there was no formal vacancy announcement posted, and Panzone said that "no paperwork" would need to be done. (Id. at 170-71.)

The position was posted again in March 2009, and Forde applied. (Id. at 20-21, 48.) Taub was the manager responsible for selecting a candidate for the position. (Compl. at 20.)

There were five applicants: Irene Kang (Asian-American); Adonis Blamoville (race unknown); Forde (African-American); Evelyn Surillo (Hispanic); and Lourdes Santiago-Ojeda (Hispanic). (<u>Id</u>.)  Forde interviewed for the position in April 2009, but was not selected.  (Forde Dep. at 176-77, 186.)

Taub instead selected Irene Kang, who had been a Contract Technician at a facility in Queens.  (<u>Id</u>. at 151, 176-81; Compl. at 48)  Taub stated that he made the selection decision based on materials that each applicant completed, as well as the interviews he conducted. (Compl. at 21-22.)  According to Taub, Kang performed better in her interview and had a superior application than Forde. (<u>Id</u>.; Forde Dep. at 190.)  Specifically, he stated that Kang had superior computer skills, including proficiency in Excel, and that she had used these skills to save the postal service $300,000 on one occasion. (Compl. at 21.)

Forde initially testified that she believed she was not selected because Taub always intended to hire Kang, having worked with her previously, and because Forde had difficulty working with her colleagues in the past. (<u>Id</u>. at 178.)  At one point during her deposition, when asked if she felt that she did not get the position because of her race, Forde responded:

> No, no, no. I'm not saying that because I'm African-American I'm not going to get the job. No, I don't know. I don't know if that played a part. I'm just saying that working with the people from the district, the years that I've worked with them, I don't see me—I didn't see getting a job there.

(<u>Id</u>. at 181-82.)  Forde later testified that she does believe that her race played a part in not being selected, but she was largely unable to provide a specific factual basis for that belief.  (<u>Id</u>. at 183, 194.)  Indeed, when Forde was asked to state precisely why she believes Taub did not select her, she stated: "I believe I wasn't selected for reasons only Mr. Taub can tell you. I don't know why I wasn't selected . . . for [the] contract technician position."  (<u>Id</u>. at 189.)  She stated that she

believes that she was more qualified than Kang, although she acknowledged that she had no actual knowledge of Kang's experience or qualifications. (Id. at 188, 192-94.)

Forde testified that by late-May 2009, all her work assignments had been redirected to other employees. (Forde Dep. at 195.) In a letter dated July 20, 2009, the USPS notified Forde that her job as a Plant Contract Technician was being abolished due to declining mail volumes and staffing reductions. (Id. at 199; Abell Decl., Ex. G.) At or around this time, the USPS abolished more than 400 positions in the mail processing department. (Compl. at 34.) Eng stated that due to workload reduction, the implementation of eBuy, budget constraints, and a national initiative to standardize contracts, the USPS decided to abolish all three of the Plant Contract Technician positions in the district, including Forde's. (Id. at 33-34, 110.) He further explained that a "business decision" was made to consolidate the Contract Technician positions under the Triboro Finance Department to provide services to the entire district. (Id. at 33.) According to Eng, management had been in discussions to abolish the Plant Contract Technician positions since December 2008. (Id. at 33, 110.) Forde also admitted that she heard that all of the Plant Contract Technician positions were being abolished at the same time. (Forde Dep. at 198.)

Accordingly, in another letter dated July 29, 2009, USPS notified Forde that, beginning August 1, 2009, she would commence duties as a District Contract Technician, under the supervision of Taub, in the Triboro District Finance Office. (Abell Decl., Ex. G.) This position had the same salary, was at the same facility, and appears to be the very same position to which Forde applied in April 2009. (Forde Dep. at 201, 210-12.) At the EEOC hearing, Eng testified that Forde's transfer to the District office was "basically the same job," but he simply had to "take the extra step to abolish her job to reassign to [the] district office" for administrative

reasons.  (Pl. Opp., 5/20/11, Ex. 12 at 6.)  He further stated: "She complain she don't have work, but that's where the work actual[ly] going to be . . . a lot of work."  (Id. at 6-7.)

Forde did not accept this District Contract Technician position, however, and instead became upset, left work on sick leave due to "job-related stress," and did not return for approximately ten months.  (Forde Dep. at 208.)  Before leaving, she did not inquire about the responsibilities of the District Contract Technician position that she was offered.  (Id. at 201-03.)

Forde testified that she collected pay for the entire time that she was absent from work.  (Id. at 21-23.)  She assumed this to be sick leave pay, because she would send in leave forms every two weeks and would continue to get paid.  (Id.)  When she returned to USPS, she was first given a job as a mail processing clerk at Greenpoint Station in Brooklyn, but was shortly thereafter moved to a Sales Service Distribution position where she remained up through the filing of this lawsuit.  (Id. at 30-32.)

Relevant to her retaliation claim, Forde filed an EEO complaint in 2002, which appears to have been related to the arbitration that first awarded her the title of Contract Technician.  She also filed an EEO complaint in 2007 relating to an alleged "threat" from management.  Finally, she filed the EEO complaint that is the predicate for this litigation in May 2009, alleging race discrimination and retaliation based on her non-selection for the District Contract Technician position, as well as other scattered incidents that were not accepted for EEOC review.[3]  (Id. at 37-38; Abell Decl., Ex. C.)  She amended this complaint on July 22, 2009 to include a claim relating to the abolishment of her Plant Contract Technician position.  (Abell Decl., Ex. C.)

---

[3] This EEO complaint also alleged disability discrimination, but Forde has withdrawn that claim.  (Forde Dep. at 157-58.)

## II.    **Standard of Review**

Summary judgment is appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 23 (1986); Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999).  The Court's function on summary judgment is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of fact to be tried. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not that of a judge."  Id. at 255; see also Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997).

The court is required to view the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in that party's favor.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Delaware & Hudson Railway Co. v. Consolidated Rail Corp., 902 F.2d 174, 177 (2d Cir.1990).  Nevertheless, the non-moving party cannot rest on mere allegations or denials but must instead set forth specific facts showing there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e); Weinstock v. Columbia University, 224 F.3d 33, 41 (2d Cir. 2000) ("[U]nsupported allegations do not create a material issue of fact.").  No genuine issue exists unless there is sufficient evidence favoring the nonmoving party for a rational trier of fact to find for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249-50 (citations omitted).  The Second Circuit has made clear that "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation."  Weinstock, 224 F.3d at 41 (internal quotation marks omitted).

## III.     Title VII Legal Framework

Claims alleging discrimination or retaliation under Title VII are analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

To establish a prima facie case of discrimination, the plaintiff must show: "[1] membership in a protected class; [2] qualifications for the position; [3] an adverse employment action; and [4] circumstances surrounding that action giving rise to an inference of discrimination." Collins v. NYC Transit Authority, 305 F.3d 113, 118 (2d Cir. 2002); see McDonnell, 411 U.S. at 802. If the plaintiff succeeds in making this prima facie showing, the burden then shifts to the defendant to demonstrate a legitimate, nondiscriminatory reason for the actions taken. Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 38 (2d Cir. 1994). Once such a reason is articulated, the burden shifts back to the plaintiff to demonstrate that the reason offered is merely a pretext for discrimination. Id.; see Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-54 (1981).

In order to establish a prima facie case of retaliation, a plaintiff must present "evidence sufficient to permit a rational trier of fact to find [1] that she engaged in protected participation or opposition under Title VII, [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." Cifra v. G.E. Co., 252 F.3d 205, 216 (2d Cir. 2001) (internal quotation marks omitted). In evaluating whether this initial burden has been met, the court's role "is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005). If the plaintiff succeeds in making this showing, the burden then shifts

to the defendant to offer a legitimate, nonretaliatory reason for the actions taken. <u>Jetter v. Knothe Corp.</u>, 324 F.3d 73, 75 (2d Cir. 2003). Once the defendant has offered a legitimate reason for its actions, the burden shifts back to plaintiff to show pretext. <u>Id.</u>

With these standards in mind, the Court will now turn to whether Forde has made out a prima facie case of discrimination or retaliation.

## IV.     <u>Discrimination – Prima Facie Case</u>

The USPS argues that Forde fails to make a prima facie showing that an adverse employment action was taken against her, or that the circumstances surrounding any such action give rise to an inference of race discrimination. For the reasons stated below, the Court agrees that Forde has not met her prima facie burden.

### 1.     Adverse Employment Actions

The USPS argues first that Forde's non-selection for the April 2009 District Contract Technician position was more akin to the denial of a lateral transfer than a denial of a promotion, and thus did not constitute an adverse employment action. The USPS further asserts that the abolishment of Forde's Plant position could not constitute an adverse action because she was shifted to the District position only a week later. For purposes of Forde's prima facie burden, the Court disagrees with the first contention but agrees with the second.

An adverse employment action, for purposes of a Title VII discrimination claim, requires "a materially adverse change in the terms and conditions of employment." <u>Sanders v. N.Y.C. Human Resources Admin.</u>, 361 F.3d 749, 755 (2d Cir. 2004). The change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities," and

may include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Leibowitz v. Cornell University, 584 F.3d 487, 499 (2d Cir. 2000) (quoting Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir.2000)) (internal quotation marks omitted).

A decision not to promote an employee typically constitutes an adverse employment action. Terry v. Ashcroft, 336 F.3d 128, 139 (2d Cir. 2003); Gutierrez v. City of New York, 756 F. Supp. 2d 491, 502 (S.D.N.Y. 2010). However, in order for the denial of an ostensibly lateral transfer to constitute an adverse action, the employee must establish that the "denial of her request for a transfer created a materially significant disadvantage in her working conditions," beyond mere "subjective, personal disappointments." Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir. 2004); see Beyer v. County of Nassau, 524 F.3d 160, 164 (2d Cir. 2008) ("A denial of a transfer may also constitute an adverse employment action, but we require a plaintiff to proffer objective indicia of material disadvantage."). "[I]f a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action." Williams, 368 F.3d at 128 (quoting Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532-33 n. 6 (10th Cir.1998)).

As to Forde's April 2009 non-selection for the District Contract Technician position, the USPS stresses that there was no adverse action because the two positions had the same title and pay, worked out of the same building, and had similar basic responsibilities. The USPS also argues that Forde's contention that her non-selection constituted an adverse action is "severely

undermined" by the uncontroverted evidence that Ed Panzone offered her a similar position in the District office in the fall of 2008.

The Court finds, however, that there is sufficient evidence of record to show that Forde's non-selection was an adverse action. To begin with, Howard Taub, a Triboro District Manager, stated his in affidavit that the District position "ha[d] a broader scope of responsibility, dealing with over 150 customer service offices, the entire district administrative staff, as well as three mail processing plants," whereas Forde's Plant position "concentrate[d] exclusively on one plant's needs." (Compl. at 23.) Moreover, it appears from Forde's testimony and the management affidavits that starting around 2007, the Plant position was starting to be phased out as purchasing responsibilities were being decentralized, and that it was becoming increasingly difficult for Plant Contract Technicians to find tasks to fill their time. (See Forde Dep. at 195, 242-44; Def. 56.1 Stmt. ¶¶ 78-83.) Thus, while it is certainly unclear why Forde refused the District position in the fall of 2008 when Panzone offered it to her, it does appear that when she applied for it in April 2009, it would have been to her career's advantage to move over to the District office at that time. In sum, viewing the evidence in the light most favorable to Forde, Court concludes "that a reasonable jury could find that the [District position Forde] sought was objectively and materially better than the position she occupied and that, accordingly, an adverse employment action had occurred." Beyer, 524 F.3d at 164.

However, the Court cannot find an adverse employment action in the events surrounding the abolishment of the Plant position in July 2009. As an initial matter, Forde's complaint about her purchasing duties being reassigned during the end of her tenure in the Plant position, standing alone, does not constitute an adverse employment action, since there is no evidence that

it resulted in any tangible harm to her, such as a demotion or a decrease in pay.[4]  See Weeks v.

N.Y. State (Div. of Parole), 273 F.3d 76, 86 (2d Cir. 2001) ("Weeks' allegation that her cases

were transferred to other officers is insufficient" to constitute an adverse employment action)

abrogated on other grounds by Morgan, 536 U.S. 101 (2002); Staff v. Pall Corp., 233 F. Supp. 2d

516, 531 (S.D.N.Y. 2002) ("[T]he transfer of a project on which Plaintiff had been working to

another employee, without more, is not an adverse employment action.").  As noted previously,

it appears that this decrease in workload was part of management's process in phasing out the in-

plant Contract Technicians and consolidating those duties within the Triboro District unit.

If management had ultimately abolished Forde's position and effectively fired her, she

could undoubtedly claim an adverse action as a result of these events.  However, the record

cannot support that reading.  Forde was notified on July 20, 2009 that her position was being

abolished but that she would remain a full-time "unencumbered" employee and could bid on new

assignments as they were posted.  (Forde Decl., Ex. G.)  A mere nine days later, USPS informed

her that she had been reassigned as a Contract Technician in the Triboro District Finance Office:

the very same title, department, and supervisor to which Forde had applied in April 2009.  Even

viewing the record in the light most favorable to Forde, it appears that USPS simply transferred

Forde into what was apparently a more beneficial position—one that she herself had desired only

three months prior.  There was no change in pay, title, or benefits, and the transfer to the District

level was, if anything, a greater opportunity for responsibility.  At her deposition, Forde herself

was unable to explain why she viewed these events as adverse, and conceded that she never even

inquired about the details of the District position to which she had been transferred.  She

---

[4] The USPS appears to group Forde's allegations related to her decreasing workload with the claims that the EEO Office determined were time-barred, discussed infra, even though the EEO report did not find them untimely but rather dismissed them for failure to state an adverse employment action.  (Abell Decl., Ex. C at 10.)  In any event, the Court believes that these allegations are sufficiently related to the eventual abolishment of Forde's Plant position that they should be considered here.  See Mathirampuzha v. Potter, 548 F.3d 70, 76-77 (2d Cir. 2008).

testified, "All I know is I was upset, and I left."  (Forde Dep. at 199-204.)  In fact, Forde left on sick leave for 10 months during which she still collected her full pay, was subsequently allowed to return to the USPS, and was given an available position at the same salary.  (Id. at 225-227.) Although these subsequent events are not directly at issue in this litigation, they certainly add force to the contention that management was not treating Forde adversely.

Put simply, Forde cannot maintain that her non-selection for a District Contract Technician position was an adverse action in April 2009, while simultaneously claiming that her transfer to the very same District Contract Technician position in July 2009 was also an adverse action.  Although management might not have exhibited optimal communication and transparency during this period, the Court concludes that the July 2009 events did not constitute adverse actions for purposes of a Title VII claim.

## 2.        Inference of Discrimination

Even if Forde has established one or more adverse employment actions, she nonetheless fails to demonstrate any circumstances, surrounding either her April 2009 non-selection or her July 2009 job abolishment, which give rise to an inference of discrimination.  Such an inference may arise either through direct evidence of discriminatory animus, or through evidence that the plaintiff was treated differently from a "similarly situated" employee who was not a member of her protected class. See Shumway v. United Parcel Service, Inc., 118 F.3d 60, 63 (2d Cir. 1997); Goldman v. Administration for Children's Services, 2007 WL 1552397, at *4 (S.D.N.Y. 2007). "To be 'similarly situated,' the individuals with whom [the plaintiff] attempts to compare herself must be similarly situated in all material respects." Shumway, 118 F.3d at 63.

Here, the record is devoid of any discriminatory animus, either direct or circumstantial. Forde has never alleged that anyone at USPS ever made a remark about her race.  Moreover,

during her deposition, she was unable to draw any meaningful comparisons between herself and similarly situated employees.  For example, she admitted that she was the only Contract Technician working under Leon Eng, and that she was unaware of his treating any Contract Technicians differently.  (Forde Dep. at 154.) When Forde attempted to compare herself to Contract Technician Irene Kang, she admitted that she had no knowledge that Kang was given work opportunities that Forde was not.  (Id. at 150-53, 192.)  When asked whether she knew if other Plant Contract Technicians had experienced a drop-off in purchasing duties, she admitted that she didn't know.  (Id. at 163-64.)  Indeed, when asked whether other employees were treated differently because of their race, she at one point candidly admitted, "I don't know cases of other employees."  (Id. at 156.)

Forde was similarly unable to substantiate her reasons for believing that Taub did not select her for the April 2009 District position for discriminatory reasons, and indeed conceded that she initially believed that her non-selection was attributable simply to the fact that Taub had worked with Kang previously.  (Id. at 179-84.)  She stated later that her only reason for thinking Taub had racial motivations was her personal belief that "for this particular vacancy there should have been a[n interview] panel, not a sole person."  (Id. at 194.)

Forde's opposition papers place a great deal of weight on Taub's statements during the EEOC hearing implying that Kang didn't have much prior experience overseeing work contracts.  (See Pl. Opp., 5/20/11, Ex. 13.)  However, all the evidence of record indicates that the type of contractual involvement that Forde is referencing was no longer a core responsibility of a Contract Technician, either in the Plant or the District office.  Indeed, Forde herself repeatedly asserts that she had not been directly involved in contract oversight since before 2003.  She thus

fails to demonstrate how the selection of a candidate without that type of experience might have reflected racially discriminatory treatment.

Forde also admitted that she was aware that USPS was in financial distress, and that other employees' jobs were abolished at the same time as hers.  (<u>Id.</u> at 195-98.)  Notably, she at one point conceded, "To state that my job was abolished just because I'm African-American, I don't know.  I honestly don't know."  (<u>Id.</u> at 204.)  Indeed, throughout her deposition she exhibited marked ambivalence and hesitation about whether any of management's actions towards her were racially motivated.  None of her more recent submissions have provided any additional support to her belief that she was discriminated against.

In sum, Forde is unable to present any evidence that could give rise to an inference of race discrimination.  The Court therefore concludes that summary judgment is appropriate on Forde's discrimination claim, because Forde has failed to make out a prima facie case.

**V.**     **<u>Retaliation – Prima Facie Case</u>**

The USPS likewise argues that Forde has not made out a prima facie retaliation claim, because she has not demonstrated that the USPS took any adverse actions against her, and she has not established a causal link between her Title VII protected activity and those actions.  For the reasons stated below, the Court agrees that Forde has not met her prima facie burden.

**1.**     **Adverse Employment Action**

The standard for what constitutes an adverse action in a retaliation claim is different and less demanding than in a disparate treatment claim.  <u>See</u> <u>Thompson v. North American Stainless, LP</u>, 131 S. Ct. 863, 868 (2011); <u>Burlington Northern and Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 62 (2006) ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to

discriminatory actions that affect the terms and conditions of employment."); Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 720 n.6 (2d Cir. 2010); Flynn v. N.Y. State Div. of Parole, 620 F. Supp. 2d 463, 490 (S.D.N.Y. 2009) ("[T]he standard that the plaintiff must meet is lower for a retaliation claim than for a disparate treatment claim."). However, Title VII "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." White, 548 U.S. at 67. Accordingly, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68 (internal quotation marks omitted).

For the same reasons as stated above for the discrimination claim, the Court believes that Forde has presented sufficient evidence that the April 2009 non-selection was an adverse action, but has not demonstrated that the events of July 2009 were sufficiently adverse. As to the latter conclusion, the Court is unable to infer how transferring an employee to a position with the same title and pay, but with apparently more responsibility and opportunity for advancement, could dissuade that employee from pursuing a discrimination charge—especially when the employee applied for that same position only three months prior.

## 2. Causal Connection

Assuming Forde has established one or more adverse employment actions, she must next show that a retaliatory motive played a part in these actions. She may do so either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant." Gordon v. New York City Bd. of Educ., 232

F.3d 111, 117 (2d Cir. 2000); see Dixon v. City of New York, 2008 WL 4453201, at *12 (E.D.N.Y. 2008) (same).  Here, Forde has presented no direct evidence of retaliatory animus, so the issue is whether she has done so indirectly.

At the time of the April 2009 non-selection, Forde's most recent EEO complaint had been sometime in 2007.  (Forde Dep. at 37-38.)  She is thus unable to show a causal connection through temporal proximity between the protected activity and the adverse action.  "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." Clark v. County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (internal quotations and citations omitted) (emphasis added); see also Ghaly v. U.S. Dep't of Agric., 739 F. Supp. 2d 185, 200 (E.D.N.Y. 2010).  Indeed, in order for temporal proximity to establish a causal connection, the retaliatory acts must occur in "as few as three months." Nicastro v. Runyan, 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999) ("Claims of retaliation are routinely dismissed when as few as three months elapse between the protected . . . activity and alleged act of retaliation").

Additionally, Forde has not presented any competent evidence that Taub, the selecting official for the April 2009 position, had any knowledge of her prior protected activity.  Indeed, Taub submitted an EEO affidavit in July 2009 affirming that he was not aware of any of Forde's prior EEO activity.  (Compl. at 18.)  At her deposition, Forde conceded that her April 2009 interview was the first time she ever met Taub.  (Forde Dep. at 184.)  In support of her belief that he at that time knew of her prior EEO charges, she stated only that because he "worked around human resources" she "believe[s]" he knew.  (Id.)  She later stated that the basis for her belief was that Taub was aware that Ed Panzone had offered Forde a District position in 2008.  Forde

explained that she believed Panzone made that offer because of the union arbitration that took place in August 2008 regarding the alleged reassignment of her work duties. (Id. at 186; Compl. at 76-80; Def. 56.1 Stmt. at ¶¶ 82-83.) She offered no other factual support for her strained inference that these events somehow demonstrated that Taub knew about any prior complaints of discrimination.

Moreover, it does not appear that the 2008 arbitration, even if Taub knew about it, constituted "protected activity" under Title VII, since it did not address charges of discrimination, but rather alleged violations of a collective bargaining agreement. (Compl. at 76-80.) "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000). "Thus, if the conduct complained of by the plaintiff had nothing to do with race, color, religion, sex, or national origin, an action [for retaliation] cannot be maintained under Title VII." Santucci v. Veneman, 2002 WL 31255115, at *3 (S.D.N.Y. 2002). While Forde's original grievance, filed with the NLRB, made some reference to USPS policies on "sexual harassment," it is undisputed that the only issue that was the subject of the 2008 arbitration was whether the USPS violated the collective bargaining agreement "by not allowing the grievant to perform the duties of her bid position." (Compl. at 77.) Forde has never alleged facts indicating that Taub had any knowledge of the documents Forde filed with the NLRB back in 2007, and it's clear that the actual proceedings that unfolded from the grievance had nothing to do with discrimination. Forde has thus failed to raise a triable issue of fact as to whether Taub's hiring decision was motivated by retaliation.

As to the abolishment of Forde's Plant position, it appears from the EEO affidavits, which are dated in July 2009, that management was aware of Forde's 2009 EEO complaint

around the time she was notified that her position was being abolished and that she was being transferred to the District Contract Technician position. (See, e.g., Compl. at 26, EEO Affidavit completed by Leon Eng, dated July 17, 2009.) However, much for the same reasons that the Court does not believe the July 2009 events were adverse actions, the Court likewise concludes that the record simply cannot support an inference of a retaliatory motive. Transferring an employee to a position to which she had previously applied, the denial of which was the very basis of her recent EEO charge, does not constitute retaliation—rather, it appears to be an accommodation of the employee's chief complaint.

Accordingly, the Court concludes that Forde has failed to make out a prima facie case of retaliation, as she had failed to present any evidence that a retaliatory motive played a part in management's actions.

## VI.     <u>Legitimate Reasons & Pretext</u>

The Court observes briefly that even if Forde had made out a prima facie case of either discrimination or retaliation, she would not meet her burden of rebutting the legitimate, non-discriminatory and non-retaliatory reasons offered by USPS for its actions.

The USPS has offered several pieces of evidence indicating that Irene Kang was selected for the April 2009 vacancy because she possessed superior qualifications for the position's responsibilities, and performed better in her interview. This evidence includes the sworn statements of Howard Taub, as well as a comparative assessment of Forde and Kang's application materials. (See Def. 56.1 Stmt. at ¶¶ 51-58.) Forde has offered nothing to show that these proffered reasons are mere pretext. In fact, in her deposition, Forde conceded that she had no knowledge of whether Kang was more or less qualified than she, that she had no knowledge of what kind of work Kang had performed in her prior position, and that she simply doesn't

know why she wasn't selected.  (Forde Dep. at 188-89, 192-94.)  Plainly, Forde has not

presented evidence from which a reasonable factfinder could conclude that the USPS's stated

reasons for not selecting her were pretext for discrimination or retaliation.  See El Sayed v.

Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010) (plaintiff must "come forward with

evidence establishing that it is more likely than not the employer's decision was motivated, at

least in part, by an intent to retaliate against him"); Weinstock v. Columbia Univ., 224 F.3d 33,

42 (2d Cir.2000) ("The plaintiff must produce not simply some evidence, but sufficient evidence

to support a rational finding that the legitimate, non-discriminatory reasons proffered by the

[defendant] were false, and that more likely than not [discrimination] was the real reason for the

[employment action].") (internal quotation marks omitted).

    With regard to the abolishment of Forde's Plant position, the USPS has presented

evidence that budget troubles, declining mail volumes, and technological streamlining led to the

abolishment of over 400 other positions, including all three of the Plant Contract Technician

positions within the Triboro District.  It also presented evidence that the decision to eliminate the

plant positions was conceived in December 2008, long before Forde's May 2009 EEO

complaint.  (See Def. 56.1 Stmt. ¶¶ 68-77.)  In her deposition, Forde stated that she did not

dispute the fact that the USPS was in financial distress, or that many employees were laid off.

(Forde Dep. at 195-96.)  She also conceded that she had heard all the Plant Contract Technician

positions had been abolished, and that she had "no reason to believe that that's not true."  (Id. at

198.)

    Forde has been unable to substantiate factually her belief that the USPS's reasons for

abolishing her Plant position were mere pretext for retaliatory or discriminatory motives.  (Id. at

195-207.)  At her deposition, Forde appeared to argue that because Kang was moved into a

District Contract Technician position in April 2009, it could not have been a legitimate business decision to eliminate Forde's Plant position a few months later.  (Id. at 195, 197.)  But, as it is undisputed that Forde was offered a District position right after her Plant job was abolished, the evidence indicates only that Contract Technician duties were being consolidated for the entire Triboro District, and that Forde was offered the opportunity to join the new District-wide unit. Again, although USPS may not have used the Contract Technician title with much clarity, and may not have communicated well with Forde regarding management's larger plans for the Triboro District, the record simply does not support a reading that race discrimination or retaliation was a motivating factor.

Accordingly, even if Forde had made out a prima facie case of discrimination and/or retaliation, summary judgment in favor of the defendant would be appropriate.

## VII.    Other Allegations - Exhaustion of Administrative Remedies

Forde's complaint and opposition papers contain passing references to a variety of other ways in which she feels she was mistreated at USPS.  These include allegations that:   (1) in February 2009, she was restricted from certain areas of the building; (2) from 2007 to 2008, she was required to provide daily reports of her work to Eng; (3) in 2008, she was seated in a storage room near an individual against whom she had previously filed sexual harassment charges; and (4) that at unspecified times during her employment she was denied training courses when she requested them. (See Compl. at 5; Forde Dep. at 97-98, 226-27; Abell Decl., Ex. C at 14.) However, in response to the defendant's argument that Forde failed to exhaust her administrative remedies for these claims, Forde states that she "acknowledges and concurs with Defendant that only two claims are at issue in this action"—that is, her non-selection for District Contract

Technician position in April 2009 and the abolishment of her Plant Contract Technician position. (Pl. Opp., 6/15/11, at 24.) In her most recent submission, she likewise states that she "does not challenge that the [EEOC] accepted only two issues for investigation." (Pl. Opp., 8/10/11, at 3.) However, the Court will address briefly why Forde is not entitled to relief based on these additional allegations.

As a prerequisite to bringing a Title VII action, a federal employee must timely exhaust her administrative remedies by complying with the requirements set forth in the EEOC regulations. See 29 C.F.R. § 1614.101 et seq.; Mathirampuzha v. Potter, 548 F.3d 70, 74-75 (2d Cir. 2008); Belgrave v. Pena, 254 F.3d 384, 386 (2d Cir. 2001) (per curiam); Fitzgerald v. Henderson, 251 F.3d 345, 358-59 (2d Cir. 2001). The EEOC regulations require, inter alia, that the aggrieved employee consult with an EEO counselor at the relevant agency within 45 days of the alleged discriminatory act. See Mathirampuzha, 548 F.3d at 75; 29 C.F.R. § 1614.105(a)(1). This initial 45-day period "serves as a statute of limitations; thus, as a general rule, claims alleging conduct that occurred more than 45 days prior to the employee's initiation of administrative review are time-barred." Fitzgerald, 251 F.3d at 359; see Bruce v. U.S. Dept. of Justice, 314 F.3d 71, 74 (2d Cir. 2002); Mirasol v. Gutierrez, 2006 WL 871028, at *3 (S.D.N.Y. 2006); O'Dwyer v. Snow, 2004 WL 444534, at *5 (S.D.N.Y. 2004). Moreover, in cases where the employee failed to present a claim to the EEOC, a federal court generally may not consider it. See, e.g., Fitzgerald, 251 F.3d at 359; Terry v. Ashcroft, 336 F.3d 128, 150 (2d Cir. 2003). An exception to this rule exists, however, for allegations that are "reasonably related" to the claims presented to the EEOC. Mathirampuzha, 548 F.3d at 76-77; Terry, 336 F.3d at 150-51.

Forde presented the first three claims listed above in the EEO complaint she filed on May 22, 2009, which also included her non-selection and job abolishment allegations. (Abell Decl.,

Ex. C.)  The agency accepted for investigation the April 2009 non-selection and July 2009 job abolishment, but dismissed the remainder as time-barred and for failure to state a claim. Specifically, the agency noted that Forde had not contacted an EEO Counselor until April 17, 2009, and that alleged unlawful acts occurring more than 45 days prior to that date were untimely.  (Id. at 10.)  Accordingly, Forde's allegations related to building restrictions, daily work reports, and her seating assignment are time-barred for failure to seek EEO counseling within 45 days—although, in any event, the Court concurs with the EEO Office's assessment that these did not constitute adverse actions under Title VII.  (See id. at 10.)

Forde does not appear to have presented the allegations regarding denials of training in any EEOC charge, and they are therefore not properly before this Court.  First, these additional allegations are likely time-barred for the reasons stated above.  Moreover, Forde's vague assertions about denials of training requests are not "reasonably related" to the claims presented to the EEOC, such that the EEOC was on adequate notice to investigate them.  See Mathirampuzha, 548 F.3d at 76-77 (allegations may be reasonably related where "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination").  In any event, Forde's inability to describe the requested training, or why she needed it, and her admission that she has no knowledge of whether other Contract Technicians received such training, would be fatal to establishing a case of discrimination or retaliation.  (Forde Dep. at 97-98, 100, 225-27.)

Finally, the Court notes that the record does not support, and Forde does not appear to argue, that the above allegations should be deemed timely pursuant to the "continuing violation doctrine."  "Under that doctrine, if a plaintiff has experienced a 'continuous practice and policy of discrimination, . . . the commencement of the statute of limitations period may be delayed

until the last discriminatory act in furtherance of it,'" <u>Fitzgerald</u>, 251 F.3d at 359 (quoting <u>Gomes v. Avco Corp.</u>, 964 F.2d 1330, 1333 (2d Cir.1992)), and the plaintiff "is entitled to have a court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred," <u>Van Zant v. KLM Royal Dutch Airlines</u>, 80 F.3d 708, 713 (2d Cir.1996).  The Supreme Court has cautioned that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." <u>National Railroad Passenger Corp. v. Morgan</u>, 536 U.S. 101, 114 (2002). Thus, the continuing violation doctrine in the Title VII context is typically limited to hostile work environment claims, which by their "very nature involve[] repeated conduct." <u>Id.</u> at 115; see <u>Mirasol</u>, 2006 WL 871028, at *4-5.

Here, even if considered in combination, Forde's allegations do not make out a hostile work environment claim.  To begin with, "a plaintiff may not rely on a continuing violation theory of timeliness unless she has asserted that theory in the administrative proceedings." <u>Fitzgerald</u>, 215 F.3d at 360; <u>Scrozton v. Town of Southold</u>, 2010 WL 1223010, at *4 (E.D.N.Y. 2010) ("To take advantage of the continuing violation exception, however, a plaintiff must clearly assert that theory of timeliness both in his EEOC charge and in his complaint.").  Second, Forde's allegations do not meet the high threshold of demonstrating that her "the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." <u>Alfano v. Costello</u>, 294 F.3d 365, 373 (2d Cir. 2002). Finally, as noted previously, the record does not give rise to any inference that USPS management took any of its actions because of Forde's race.  <u>See id.</u> at 374 (noting that it is "axiomatic" that order to show a hostile work environment, a plaintiff must demonstrate that the conduct occurred because of her membership in a protected class).

Accordingly, to the extent Forde continues to press these additional allegations, summary judgment in favor of the defendant is granted.

## VIII.   **Forde's Discovery Request**

In her most recent submission, Forde belatedly asserts that some of the defendant's discovery responses were "misleading and insufficient," and she asks that the Court afford her more time to obtain unspecified additional facts to support her claims.   (Pl. Opp., 8/10/11, at 1.) Under Rule 56(d)(2) of the Federal Rules of Civil Procedure, where "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . allow time to obtain affidavits or declarations or to take discovery."  However, such relief would not be appropriate in this case.  Forde's request comes eight months after the magistrate closed discovery in this case, and Forde provides no "specified reasons" regarding why she could not have raised this matter earlier, why the defendant's prior discovery responses were inadequate, or what she believes further discovery will show.  See Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir. 2001) ("[A] party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing (1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts.").  Therefore, her request is denied.

**IX.**     <u>**Conclusion**</u>

For the stated reasons, summary judgment is GRANTED to the defendant in full.  The

Clerk of Court is directed to enter judgment and close the case.

SO ORDERED.

Dated: Brooklyn, New York
        March 26, 2012

_____/s/_____
Carol Bagley Amon
Chief United States District Judge